E-FILED
Monday, 01 February, 2021  11:44:34 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHELLE MOTTERSHAW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-3297 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Michelle Mottershaw appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Insurance Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Mottershaw filed Plaintiff's Motion for Summary Judgment (d/e 12). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 15). Mottershaw filed Plaintiff's Reply Brief (d/e 17). This matter is before the Court for a Report and Recommendation. For the reasons set forth below, the Decision of the Commissioner should be REVERSED and REMANDED.

## BACKGROUND

Mottershaw was born on April 11, 1971.  After high school, she completed vocational training and became a licensed practical nurse (LPN) in 1993.  She worked as an LPN from 1993 until 2001, and in 2001, she completed two years of college and became a registered nurse (RN).  She worked as an RN from 2001 until she stopped working in December 2012. Mottershaw suffered from fibromyalgia and anxiety.  She alleged that she became disabled on December 15, 2012 (Onset Date).  She was last insured for Disability Benefits on March 31, 2017 (Last Date Insured). Certified Transcript of Proceedings before the Social Security Administration (d/e 9) (R.), at 24, 31, 48, 53, 221.

## STATEMENT OF FACTS

### Statement of Facts Before the Evidentiary Hearing

On October 26, 2012, Mottershaw saw her primary care physician Dr. David Pittman, M.D., for nausea and fatigue.  She reported that she experienced fatigue, excessive sleepiness, and occasional nausea for several days.  She was working on the cardiac floor at St. John's Hospital in Springfield, Illinois.  R. 407.  On examination, Dr. Pittman reported normal results.  Mottershaw had no edema.  Dr. Pittman assessed a viral infection.  R. 408.

On March 6, 2013, Mottershaw saw rheumatologist Dr. Jason Guthrie, M.D. for arthralgias.  She told Dr. Guthrie that for that past seven months she experienced "bone pain."  She said that she hurt all over and had never had these symptoms before.  She was not stiff in the mornings, but her symptoms worsened over the course of a day.  She wanted to sleep all day and reported generalized swelling in her hands.  She was taking Cymbalta for depression.  R. 404.  On examination, she had normal range of motion, normal strength in all extremities, normal gait, and no trigger points.  Dr. Guthrie could not determine the cause of Mottershaw's pain.  He discussed the possibility of fibromyalgia but noted that "it would be difficult to make that diagnosis without any significant trigger points."  He also stated that her symptoms could be "somatization from her current mood disorder."  Dr. Guthrie ordered blood tests, including a rheumatoid factor test.  R. 406.

On March 13, 2013, Mottershaw saw Dr. Guthrie.  The rheumatoid factor test and the rest of the tests were negative for inflammatory causes or other causes for her pain.  She had tried Lyrica and thought that it helped.  Dr. Guthrie again stated that her symptoms could be fibromyalgia or somatization disorder.  On examination, her muscle strength was grossly normal, she had no synovitis, and she had multiple trigger points.  R. 402.

Dr. Guthrie assessed myofascial pain and stated that her mood disorder could be the "main cause for her symptoms." He also prescribed Lyrica and advised, "Most importantly, I think she needs to start a low-impact aerobic exercise and weight loss program starting as soon as possible." Mottershaw understood. R. 402-03.

On April 17, 2013, Mottershaw saw Dr. Guthrie. She reported some improvement in her muscle pain after starting the Lyrica, but also noticed "a little bit of swelling and some mild headaches." She was concerned that she would have more pain if she did yard work. On examination, she had about 10 tender points, but no synovitis. She also had normal muscle strength in her extremities. R. 400. Dr. Guthrie assessed fibromyalgia and increased her Lyrica dosage. He again noted that Mottershaw's "anxiety and stress is likely contributing to the majority of her myofascial pain." Dr. Guthrie recommended that Mottershaw continue low impact aerobic exercise and prescribed tramadol for pain. R. 401.

On April 23, 2013, Mottershaw saw Dr. Guthrie. She took the increased Lyrica dose, but was having more pain. The pain had never been so bad. Performing daily activities was "very difficult." She also reported that she experienced no improvement from taking the tramadol. R. 398. On examination, Mottershaw had 18 of 18 trigger points. She had

tenderness over the large muscle groups, her proximal muscle strength was normal, and her gait was normal.  R. 398.   Dr. Guthrie reduced her Lyrica dosage and prescribed Savella.  He stated that he would notify Dr. Pittman that the Savella prescription would require stopping the Cymbalta prescription and switching Mottershaw to a different antidepressant.  R. 399. On April 25, 2013, Dr. Pittman discontinued Mottershaw's Cymbalta prescription and stared her on citalopram.  R. 397.

On July 10, 2013, Mottershaw saw Dr. Guthrie. She had recurrent lateral epicondylitis (tennis elbow).  Her tennis elbow symptoms remained stable for two months.  R. 389.  At the time of this appointment, Mottershaw had stopped taking the Savella and was again taking Cymbalta.  She was also taking Lyrica.  R. 390.  She had been having edema as a side effect of taking Lyrica.  Dr. Pittman prescribed a diuretic that appeared to be helping.  Mottershaw said she had less edema.  The edema was still bad some days when she was outside working, "but for the most part, she has done well with it."  R. 389-90.  On examination, she had no edema or synovitis, she had multiple trigger points, her elbow was tender without erythema or effusion, and her elbow had normal range of motion.  Dr. Guthrie gave her a cortisone injection in her elbow.  R. 391.

On July 17, 2013, Mottershaw saw Dr. Rishi Sharma, M.D., for low back pain.  She had been having low back pain since she moved several tons of rocks.  The records did not indicate when she moved the rocks.  The pain was primarily on her right side.  Activity worsened the pain, and rest eased the pain.  She had no radicular symptoms.  On examination, Mottershaw ambulated without an assistive device.  She was oriented, her recent and remote memory were intact, and her judgment and insight were good.  Her sensation was intact and she had a positive spring sign with tenderness on the sacroiliac joint.  Straight leg testing was negative, her strength was 4+/5, and she had no deficit in range of motion.  X-rays of her pelvis were negative.  Dr. Sharma assessed sacroiliitis.  R. 389.  Dr. Sharma referred Mottershaw to Dr. Gary Western, M.D., who administered a right sacroiliac joint cortisone injection under fluoroscopic guidance.  R. 388.

On October 9, 2013, Mottershaw saw Dr. Guthrie.  She reported more muscle pain.  Dr. Guthrie noted,

> There has been a direct correlation between her increased muscle pain and anxiety.  She has a lot of stress at home and soon to be home schooling her 2 children.  There has always been a correlation with her stress and her pain.  She had a really good summer because she had low stress.

R. 385. On examination, Mottershaw had no rashes and no evidence of synovitis. She had more than 10 positive trigger points and her gait was normal. Dr. Guthrie diagnosed fibromyalgia. He said he "maxed out all the medications we can offer." He recommended that Mottershaw see a psychiatrist to address her anxiety and noted, "Once again, I think [her anxiety] is the biggest driving force for her myofascial pain." R. 386.

On February 3, 2014, Mottershaw saw Dr. Pittman. Tramadol was not relieving her pain and she said that Dr. Guthrie was hesitant to prescribe anything stronger. She was reluctant to see a psychiatrist as Dr. Guthrie had recommended. She tried taking Savella, but that did not "react favorably with her." R. 380. On examination, Mottershaw was anxious. R. 381. Dr. Pittman "highly recommended a psychiatrist." She said that she would "give it some thought." R. 381. Dr. Pittman did not prescribe opiate pain medicine. He recommended seeing a psychiatrist and rheumatologist. He also recommended continuing water therapy. R. 381-82.

On October 22, 2014, Mottershaw saw Dr. Pittman. She was having problems with her sleep medication Ambien and she had started sleepwalking. She broke a lamp while sleepwalking and did not remember the event. She also reported that her dermatologist said that her Lyrica was causing a rash. She reduced her Lyrica dosage due to the rash. R.

377.  On examination, Mottershaw had no edema, her upper extremity strength was full and symmetrical, and her gait was normal.  R. 378.  Dr. Pittman discontinued Ambien and prescribed Lunesta instead.  He also requested the dermatologist's records regarding the rash.  R. 379.

On November 20, 2014, Mottershaw saw rheumatologist Dr. Ying Du, M.D.  R. 339-41.  Her pain had gotten worse over the winter and she had started taking hydrocodone.  She still had diffuse pain, worse in her arms and upper body.  Excessive activity made the pain worse and medication reduced the pain.  She rated her pain at 5 or 6 out of 10 and said she had trouble sleeping and took Lunesta.  She had not noticed any joint swelling.  R. 339.  She also reported symptoms of headaches, back pain and joint pain, fatigue, anxiety, and insomnia.  Dr. Du's examination of Mottershaw was normal.  He noted no synovitis and no trigger points.  R. 341.  Dr. Du added a prescription for tizanidine to her medications and ordered blood tests.  R. 338.

On February 13, 2015, Mottershaw saw Dr. Pittman complaining that she had not been able to lose weight.  She said that since January she had restricted herself to 1300 calories per day and engaged in regular exercise but had not lost weight.  R. 369.  On examination, she had no edema; her upper extremity strength was full and symmetrical; her gait was normal;

and she had no neurological deficits.  R. 370.  Dr. Pittman concluded that the inability to lose weight was related to her age.  He also said that her medications Lyrica and Cymbalta might "mitigate some improvements" in her efforts to lose weight.  He recommended reducing her calorie intake more and exercising more.  He also gave her information on a weight loss program.  R. 371.

On March 12, 2015, Mottershaw saw Dr. Du.  She reported more bad days than good.  She had pain everywhere, worse in her arms and trunk.  She did not take the tizanidine during the day because it made her groggy.  She had trouble sleeping and woke multiple times during the night and she had stiffness in the morning for two and a half hours.  The Lyrica helped but did not last long enough.  R. 335.  Dr. Du's examination was normal except that Mottershaw was uncomfortable.  She had no synovitis and no trigger points.  R. 337.  Dr. Du changed the dosage on her Lyrica prescription and added a prescription for Elavil (amitriptyline).  R. 335.

On July 16, 2015, Mottershaw saw Dr. Du.  She reported to Dr. Du that she hurt everywhere and she had not seen a pain doctor.  She had trouble sleeping.  She told Dr. Du that she had not worked since 2012 and she was applying for disability.  R. 332.  Mottershaw reported symptoms of fatigue, insomnia, back pain and joint pain.  On examination, she had no

trigger points and no edema, her memory was normal, and she was uncomfortable and upset. Her examination was otherwise normal. R. 334. Dr. Du again prescribed Elavil for insomnia. R. 332.

On December 4, 2015, Mottershaw saw Dr. Sharma for right shoulder pain. She had pain in her right shoulder for two months. The pain radiated down her right arm and she had not had an injury. She did not have numbness or tingling. On examination, she had full range of motion without pain or discomfort. She had tenderness to palpation at the head of the biceps. She had full strength. X-rays of the right shoulder showed well-maintained alignment with no fractures or dislocation. Dr. Sharma assessed right shoulder tendonitis, administered a cortisone injection and provided Mottershaw with strengthening and range of motion exercises. R. 365.

On March 28, 2016, Mottershaw saw Dr. Sharma for left foot pain. R. 359. On examination, she was oriented, her recent and remote memory was intact, her mood was normal, and her judgment and insight were good. She walked normally and the passive range of motion of her ankle was within normal limits. Dr. Sharma prescribed rest, ice, compression and elevation. R. 360-61. She was also given exercises for ankle range of motion, stretching, and strengthening. R. 358.

On May 4, 2016, state agency Dr. Marion Panepinto, M.D., opined that Mottershaw's fibromyalgia and anxiety were non-severe impairments. R. 81.

On June 28, 2016, Mottershaw saw Dr. Pittman for high blood pressure, headache, palpitations, and night sweats.  R. 459.  On examination, her blood pressure was 128/88; her heart had regular rate and rhythm with no murmur; her extremities had no edema; her upper body strength was full and symmetrical; and her gait was normal.  R. 460.  Dr. Pittman found that she was asymptomatic for cardiac problems.  He ordered lab work including an electrocardiogram (EKG) and creatine phosphokinase (CPK) level.  R. 461.

On July 11, 2016, Dr. Du wrote a letter regarding Mottershaw's condition.  Dr. Du stated,

> Michelle Mottershaw is currently under my medical care for fibromyalgia. This condition causes diffuse pain and stiffness. She has been treated with prescription medicines. She has not been able to work due to significant pain and stiffness from fibromyalgia as well as fatigue and drowsiness from her medicines.

R. 468.

On July 22, 2016, Dr. Du completed a form regarding Mottershaw's impairments.  Dr. Du stated that she had a history of widespread pain, stiffness, tension headaches, paresthesia, sensation of swollen hands,

sleep disturbance, and chronic fatigue.  He opined that Mottershaw could work "None" hours per day; stand for 15 minutes at one time; stand "None" during a workday; sit for 60 minutes at one time; sit for a total of 60 minutes during a workday; occasionally lift 10 pounds; frequently lift 5 pounds; occasionally bend, stoop, and raise both arms about shoulder level.  R. 469.

On August 17, 2016, state agency psychologist Dr. Darrell Snyder, Ph.D., opined that Mottershaw's anxiety disorder was not a severe impairment.  R. 91-93.

On August 22, 2016, state agency physician Dr. Richard Bilinsky, M.D., opined that Mottershaw's fibromyalgia was a severe impairment.  R. 92.  Dr. Bilinsky prepared a Physical Residual Functional Capacity Assessment of Mottershaw.  R. 94-97.  Dr. Bilinsky opined that she could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently stoop, crawl, and climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds.  Dr. Bilinsky opined that Mottershaw should also avoid concentrated exposure to extreme cold, vibration, and hazards.  He found no other functional limitations due to her physical impairments.  R. 95-96.

On October 21, 2016, Mottershaw saw advanced practice nurse Shannon Fasig, APN, for a physical and to establish care with a new primary care physician Dr. David Sandercock, M.D.  R. 557-62.  Dr. Pittman was her previous primary care physician.  R. 557.  Mottershaw reported that her fibromyalgia was not well-controlled.  She took Lyrica and tramadol and her rheumatologist would not prescribe anything stronger. Her symptoms felt worse in the winter, her blood pressure was well-controlled, and she had no swelling.  She reported that she slept well and did not exercise regularly.  R. 557.  On examination, Mottershaw had a normal examination for edema; normal gait and station; normal digits and nails; normal muscles, joints, and bones; 2+ reflexes and symmetric; normal range of motion; normal stability; no sensory loss; intact recent and remote memory; and normal judgment, insight, mood, and affect.  Fasig noted rales, crackles, and wheezing in examination of her lungs.  R. 561. Fasig prescribed an antibiotic, administered a flu vaccine injection and ordered blood work.  R. 561.

On April 6, 2017, Mottershaw nurse practitioner Sara Bruckerhoff, NP, in Dr. Du's offices.  R. 471-76.  Bruckerhoff noted that Dr. Du prescribed Elavil for Bruckerhoff at her last visit in 2016.  Mottershaw reported that she stopped taking the Elavil after a month because it did not

help.  She was referred to a pain specialist but could not find one who took her insurance.  Her new primary care physician put her back on tramadol. Mottershaw stated that she never had any trigger points.  She had pain in her whole body that felt like the flue and she had been in bed the past few days.  She woke up every two to three hours and had diffuse pain that was worse in her upper body.  She also had morning stiffness for a couple of hours.  R. 471.  Bruckerhoff's examination showed normal findings with no edema.  R. 473.  Bruckerhoff assessed a flare up of fibromyalgia and insomnia and recommended continuing her current medications for fibromyalgia, prescribed Restoril for her insomnia, and ordered a sleep study.  R. 474.

On July 20, 2017, Mottershaw saw advanced practice nurse Fasig for problems sleeping and urinary hesitancy.  R. 551-55.  She reported that every other day she had to sit and massage her lower abdomen before she could start urinating.  The symptoms last the whole day and the problem had been going on for several months.  She had no other urinary symptoms.  She also reported that she had "[h]orrible insomnia."  She took eight Benadryl, one to two muscle relaxers, and three to four tramadol throughout the night to help her sleep.  The medications were not helping. She fell asleep for an hour and then was wide awake.  She reported that

she did not nap during the day. She did housework during the day; however, sometimes she spent two to three days in bed due to pain. R. 551. On examination, she had no edema; normal gait and station; normal muscles, joints, and bones; normal range of motion; normal muscle tone and strength; no sensory loss; and normal mood and affect. R. 554. Fasig believed the urinary retention was related to taking eight Benadryl per night. Fasig renewed Mottershaw's medications and referred her to a neurologist. Fasig told Mottershaw to take two Benadryl as needed at night, not eight, and to drink 60 ounces of water a day. Fasig encouraged Mottershaw to eat a healthy diet and engage in regular exercise. R. 555.

On August 31, 2017, a Medical Source Statement form was completed. R. 477-80. The Administrative Law Judge (ALJ) concluded that nurse practitioner Bruckerhoff completed the form. Mottershaw argues that Bruckerhoff and Dr. Du both completed the Medical Source Statement. The Medical Source Statement was signed by only one person. Underneath the signature the following hand-printed names appear, "Sara Bruckerhoff NP-C/Ying Du MD". R. 480. The signature is illegible. R. 480. The signature does not match Dr. Du's signature on her July 11, 2016 letter or her July 22, 2016 opinions. See R. 468, 469. The record does not contain a handwritten signature by Bruckerhoff. The only signature

appears to be a facsimile signature on the record of the April 2017 office visit, either stamped or computer generated.  R. 475.  The illegible signature does not match the facsimile signature either.  The Medical Source Statement contains a correction to one answer on the form.  Next to the correction is written Bruckerhoff's initials with the word, "error."  R. 479.  The hand-printing on this form also does not match the hand-printing of Mottershaw's name on Dr. Du's July 22, 2016 opinion.  See R. 469.  Considering this evidence, the Court finds that substantial evidence supports the ALJ factual finding that Bruckerhoff prepared the August 31, 2017, Medical Source Statement.

Bruckerhoff stated that Mottershaw had chronic wide-spread pain, fatigue, insomnia, morning stiffness, short-term memory issues, urinary hesitancy, and constipation.  The pain increased with activity, was severe without medications, and was chronic.  The clinical findings and objective signs were "tenderness to a few trigger points, mostly subjective pain + anxiety."  Bruckerhoff opined that the impairments lasted for more than 12 months and that emotional factors contributed to the severity of Mottershaw's symptoms and functional limitations.  R. 477.  She wrote that anxiety affected Mottershaw's physical condition.  Bruckerhoff opined that Mottershaw could walk three blocks, sit for 15 minutes, sit for less than two

hours in an eight-hour workday, and stand/walk for less than two hours in an eight-hour workday.  She needed to be able to change positions at will during an eight-hour workday.  She had to walk at least 60 minutes during an eight-hour workday.  She needed to take unscheduled breaks every few hours for 20-30 minutes during an eight-hour workday.  She needed the breaks due to muscle weakness, pain, paresthesia, numbness, chronic fatigue, and side-effects of medications.  Mottershaw needed her legs elevated during prolonged sitting.  She needed to elevate her legs due to swelling.  In response to the question, "[I]f your patient had a sedentary job, what percentage of time during an 8-hour workday should the leg(s) be elevated," Bruckerhoff responded "N/A."  R. 479.  Bruckerhoff said that Mottershaw could occasionally lift less than 10 pounds, rarely lift 20 pounds, and never lift 50 pounds.  She had no limitations in her ability to reach, handle, or finger objects.  R. 479.  Bruckerhoff opined that Mottershaw would off-task 25 percent of the workday and would be incapable of low stress work due to anxiety attacks.  Bruckerhoff stated that Mottershaw had good days and bad days and would be off work more than four days per month.  Bruckerhoff concluded, "Pt is a RN, cannot give medications, stay awake, handle stress of job."  R. 480.

On September 21, 2017, Mottershaw saw advanced practice nurse Fasig. R. 546-50. She saw Fasig to get a refill of her tramadol prescription. She said that Dr. Du's office gave her Tylenol #3 and meloxicam, but these medications made her sick. She asked Fasig for a prescription for 180 tramadol. Mottershaw took three tramadol at a time, three times a day, for a total of nine tramadol a day. She described her pain as a severe case of the flu with aching all over and said the tramadol was the only medication that helped. Fasig noted that Mottershaw, "States she is aware of the opioid epidemic and is not an addict." R. 546. On examination, she had bilateral ankle 1+ pitting edema; her fingers were slightly swollen; her gait and station were normal; her joints, bones, and muscles were normal; her range of motion was normal; her muscle strength and tone were normal; her stability was normal; her sensory examination was normal; her recent and remote memory were intact; and her judgment, insight, mood, and affect were normal. R. 549. Fasig gave Mottershaw a flu vaccine and prescribed tramadol, one tablet four times a day as needed for pain. Fasig told Mottershaw to take the tramadol as prescribed. Fasig said that her rheumatologist would "take over pain management from now on." R. 550. Fasig said that Mottershaw had a rheumatology appointment in October 2017. R. 550.

On April 26, 2018, Mottershaw underwent a sleep study.  Dr. Pavinderpal S. Gill, M.D., performed the sleep study. R. 577-79.  The study did not show any apneas or hypopneas.  Mottershaw was very restless during the night.  She had 14 body position changes and went to the bathroom three times.  She did not have REM sleep during the study.  The REM sleep may have been suppressed by her SSRI medication.  Dr. Gill stated that if clinical suspicion of sleep apnea remained high, Mottershaw should discontinue her SSRI medication two weeks before repeating a sleep study.[1]  Dr. Gill concluded, "The patient has highly fractured sleep. She may benefit from sleep consolidation therapy."  R. 579.

<u>The Evidentiary Hearing</u>

On April 27, 2018, the day after the sleep study, the ALJ conducted an evidentiary hearing in this case.  R. 39-77.  Mottershaw appeared with her counsel.  Vocational expert Lisa Gagliano also appeared.   R. 41.

Mottershaw's attorney asked the ALJ to keep the record open to allow her to file the results of the sleep study from the night before.  The ALJ asked why the sleep study would be relevant since the study occurred more than a year after the Date Last Insured.  Mottershaw's attorney stated that Mottershaw had "been having sleep issues for quite some time and

---

[1] The record does not indicate which medication was the SSRI medication to which Dr. Gill referred.

from what he understood, one symptom of fibromyalgia is sleep deprivation." R. 43. The ALJ responded that Mottershaw stated at her October 2016 office visit with nurse practitioner Fasig in Dr. Sandercock's Office that she was sleeping well. The ALJ stated that Mottershaw noted sleeping problems at the April 2017 office visit with nurse practitioner Bruckerhoff but that was after the Date Last Insured. The ALJ stated,

> I see an October of '16. This is in 8F, pages 21 and 24, again, October of '16. Prior to the date last insured. It says she was sleeping well. She had no sleep disturbance. I do see a note, just after her date last insured. This would've been in April of '17, in 5F, where she reports having trouble sleeping, but unless I missed it, I think that's the first reference in the record of sleeping issues.

R. 43. Mottershaw's attorney responded that Mottershaw mentioned sleeping problems at the October 2012 office visit with Dr. Pittman, but the ALJ noted that the visit was before the Onset Date and Mottershaw was working at the time of that visit. The ALJ, however, agreed to hold the record open to allow Mottershaw to file the results of the sleep study. R. 44.

Mottershaw testified at the hearing. She stopped working in December 2012. She started feeling bad in September 2012, started missing work, and had to quit in December. R. 49. At the time of the hearing, she lived in a house with her husband, mother, and her two sons then aged 15 and 16 years. The house was a one-story home with a

finished basement.  R. 49-50.  She had a driver's license and had no restrictions on her driver's license, and no doctor had put limitations on her driving.  She drove to pick her sons up after school.  Her mother drove her sons to school because she did not have the energy to drive them in the morning.  She said she was "wiped out from no sleep at night."  R. 51-52.

Mottershaw testified that insomnia was her biggest problem from her fibromyalgia.  She did not sleep at night and was fatigued all day.  She woke up every hour to hour and a half at night and she stayed awake anywhere from a few minutes to an hour.  She sometimes napped during the day.  Other times, "I lay there" and listen to or watch television.  R. 54. She felt that she could go to sleep at that moment in the hearing.  She said she felt that way all day and did not have the strength or concentration to work.  R. 54.

Mottershaw testified that she spent four to five hours a day in bed, off and on.  The rest of the day, she put away laundry, washed dishes, and dusted weekly.  Her mother did the laundry, swept and mopped the floors, and did the other housework.  R. 55.

Mottershaw said she did not think clearly anymore and had a "horrible memory."  She had to be reminded of doctor's appointments and other

appointments.  She used a grocery list to shop, but sometimes still did not get some of the items on the list.  R. 55-56.

Mottershaw described her pain as being "like the worse (sic) case of flu that you can have."  R. 56.  She had pain everywhere from head to toe.  She was on medication and her doctors did not have any other medication options for her.  Her doctors prescribed physical therapy, but it did not help.  The doctors also recommended exercise but did not provide specific exercises.  R. 57.

Mottershaw said that Dr. Du was her rheumatologist.  She started seeing Dr. Du in 2017.  R. 57.  Dr. Du increased the dosage of tramadol and added muscle relaxants to her medications.  The changes to her medications did not help.  Dr. Du told Mottershaw that she had no other treatment alternatives.  R. 58.

Mottershaw said that her fibromyalgia caused difficulty urinating.  She had to sit and massage her bladder 10 to 15 minutes before she could initiate a stream.  She urinated about eight times a day and had trouble urinating about half of the time.  R. 59, 65-66.

Mottershaw's fibromyalgia also caused her to itch all over.  She also had constipation and swelling in her hands and feet from her medications.  She did not wear jewelry anymore because of the swelling and also had

problems putting on shoes due to the swelling.  She took a diuretic and potassium supplement for the swelling, R. 59, 67, and felt irritable, frustrated, and angry because "there's nothing really they can really do, other than what I'm doing right now."  R. 60.

Mottershaw said she had good days and bad days.  On good days, she got up, drank coffee, and watched television for a couple of hours.  Then she helped her mother clean by putting away laundry and washing the breakfast dishes.  After that, she lay down for two or three hours.  Then, she picked up her sons at school.  She made "an easy supper" such as hamburgers and it took 30 minutes to prepare supper.  After supper, she lay down again and she was usually in bed by 5:30 or 6:00 p.m.  She stayed in her room until the next morning watching television and sometimes fell asleep.  On good days she sometimes went grocery shopping with her mother.  R. 63-65.

On bad days, she lay in bed all day.  She either slept, watched television, or played on the computer.  She did not do any cleaning, she did not pick her sons up from school, and she did not prepare supper.  She had bad days two to three times a week.  R. 66.

Vocational expert Gagliano then testified.  Mottershaw stipulated to Gagliano's qualifications to testify as a vocational expert.  R. 69.  The ALJ asked Gagliano the following hypothetical question:

> And for the first hypothetical, I would like you to assume a hypothetical individual of the Claimant's age, education, and with the past jobs we just discussed. Further assume, this individual can perform work at the light exertional level, can occasionally climb stairs and ramps, stoop, crouch or crawl. Can never climb ladders, ropes or scaffolds. Must avoid concentrated exposure to extreme cold, vibration, moving machinery, unprotected heights, and no commercial driving. Can such a hypothetical individual perform any of the Claimant's past work?

R. 70.  Gagliano opined that such a person could perform Mottershaw's past work as a school nurse as described in the Department of Labor's Dictionary of Occupational Titles (DOT).  R. 70.  The ALJ asked Gagliano to assume the person in the question was limited to sedentary work. Gagliano opined that the person could not perform Gagliano's past work. Gagliano opined that such a person could perform other jobs, such as final assembler, with 21,000 such jobs nationally; a visual inspector and touch-up screener, with 17,000 such jobs nationally; and sorter, with 10,000 such jobs nationally.  R. 71-72.  The person could perform these jobs if she needed to have an option to sit or stand while working.  R. 72.  The person could also perform these jobs if she was limited to jobs that could be learned in 30 days or less.  R. 72-73.

Gagliano opined in order to work at any of these jobs, a person needed to be on-task 90 percent of the time at work. A person could not be absent more than eight times a year. A person could not take extra breaks beyond the normal two 15-minute breaks and a 30-minute lunch break. R. 73-74. The person could not elevate her legs and work the jobs Gagliano identified. R. 75. The hearing then ended.

## THE DECISION OF THE ALJ

The ALJ issued her decision on September 14, 2018. R. 22-33. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

In addition, Mottershaw's Date Last Insured was March 31, 2017.  Mottershaw applied for Disability Insurance Benefits.  She, therefore, had to show that she was disabled when she met insured status requirements which was on or before her Date Last Insured, March 31, 2017.  See 42 U.S.C. § 423(a).

The ALJ found that Mottershaw met her burden at Steps 1 and 2. Mottershaw had not engaged in substantial gainful activity after her Onset Date, December 15, 2012, and she suffered from the severe impairments of fibromyalgia and anxiety. R. 24. The ALJ stated that the record did not contain enough evidence to establish a medically determinable impairment of fibromyalgia because there was no evidence that her doctors excluded other possible causes for her symptoms. The ALJ, however, credited Mottershaw's complaints and her doctors' diagnoses and found that she had the medically determinable impairment of fibromyalgia and that it was a severe impairment. R. 30.

The ALJ determined at Step 3 that Mottershaw's impairments or combination of impairments did not meet or equal any Listing. R. 26-28.

At Step 4, the ALJ determined that Mottershaw had the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except can occasionally climb stairs and ramps, stoop, crouch or crawl. She can never climb ladders, ropes or scaffolds; and must avoid concentrated exposure to extreme cold, vibration, moving machinery, unprotected heights, and no commercial driving. With work that can be learned within 30 days or less, with simple routine tasks, routine workplace changes, and simple work related decisions.

R. 28. The ALJ relied on numerous physical examinations prior to the Date Last Insured that were essentially normal with no edema and normal gait, normal strength, normal range of motion, intact memory, normal mood, affect, judgment, and insight.  The ALJ noted the October 2016 examination in which Mottershaw denied any mental health symptoms and she reported no joint stiffness and that she was sleeping well.  The ALJ also relied on the examination findings by Dr. Du which revealed no abnormalities and showed no trigger points.  The ALJ noted nurse practitioner Bruckerhoff's April 2017 examination also was normal.  The ALJ also noted that the x-rays in the record were normal and the straight leg test in the record was negative.  The ALJ further relied on the fact that Mottershaw did not seek help from a mental health professional to treat her anxiety and never went to the emergency room for help with her anxiety. R. 29-31.

The ALJ gave no significant weight to Dr. Du's opinions.  The ALJ stated that Dr. Du's opinions that Mottershaw could not work was an opinion on the ultimate issue of disability reserved to the Commissioner. The ALJ found that Dr. Du's opinions were internally inconsistent.  The ALJ gave the example that Dr. Du stated that Mottershaw could not stand while working, but also opined that she could stand for 15 minutes at a time.  The

ALJ found that his opinions were not consistent with his examination notes which revealed no trigger points and normal results.  The ALJ further found that Dr. Du's opinions were inconsistent with the other examinations of Mottershaw by other medical professionals that showed full motor strength, negative straight leg testing, and normal x-rays.  R. 29.

The ALJ noted that nurse Bruckerhoff's Medical Source Statement was dated August 2017, after Mottershaw's Date Last Insured of March 31, 2017.  The ALJ said that the medical evidence did not support Bruckerhoff's opinions that Mottershaw had to elevate her legs or that she could not sit for more than two hours in an eight-hour workday.  The ALJ also discounted Bruckerhoff's opinion because Bruckerhoff said that Mottershaw's impairments were caused by her anxiety.  The ALJ noted that Bruckerhoff had no mental health training.  R. 30.  The ALJ also said that her opinions were inconsistent with the medical examinations that found normal strength, normal range of motion, normal gait, normal mood and affect, normal judgment, normal memory, and normal insight.  R. 30-31.

The ALJ discounted the opinions of state agency physicians Drs. Bilinsky and Panepinto because they did not have the benefit of medical evidence after the dates of their opinions and they did not hear Mottershaw's testimony.  R. 31.

The ALJ discounted Mottershaw's testimony about the severity of her symptoms because the testimony was not consistent with the medical evidence and other evidence in the record that the ALJ already discussed in the opinion.  R. 31.

After determining the RFC, the ALJ found at Step 4 that Mottershaw could not perform her past relevant work as a nurse.  The ALJ relied on the RFC and the opinions of vocational expert Gagliano.  R. 31.

At Step 5, the ALJ found that Mottershaw could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the RFC determination, the Medical-Vocational Guidelines, 20 C.F.R. Part 404 Subpart P, Appendix 2, and the testimony of vocational expert Gagliano that a person with Mottershaw's age, education, work experience, and RFC could perform the representative jobs of final assembler, touch up screener, and screener.  The ALJ concluded that Mottershaw was not disabled.  R. 32.

Mottershaw appealed the decision of the ALJ.  On September 13, 2019, the Appeals Council denied her request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1; 20 C.F.R. § 404.981.  Mottershaw then filed this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to her conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

After careful consideration, the Court finds that the ALJ failed to adequately evaluate the material evidence of Mottershaw's sleeping difficulties. Mottershaw testified that her inability to sleep was the primary reason she could not work. She said her lack of sleep caused fatigue, a lack of strength, and a lack of concentration. R. 54. In explaining the basis for the RFC finding, the ALJ cited Mottershaw's statement during an October 2016 office visit that she was sleeping well. R. 26 and 30 (cited twice on this page). The ALJ did not mention Mottershaw's statements during four other office visits in which she reported difficulty sleeping. See R. 377(October 22, 2014), R. 339 (November 20, 2014), R. 335 (March 12, 2015), and R. 332 (July 16, 2015, R. 332) (Hereinafter Sleep Difficulty Reports). Mottershaw made these four Sleep Difficulty Reports to her healthcare providers after the Onset Date and before the Date Last Insured. The ALJ incorrectly stated at the hearing that the October 2016 office visit was the only medical record from after the Onset Date and before the Date Last Insured in which Mottershaw reported about her sleep. The ALJ incorrectly stated that the first report of sleeping problems after the Onset Date was at an April 2017 office visit, after the Date Last Insured. R. 43-44. Given the ALJ's erroneous statement at the hearing, and her omission of any discussion of the Sleep Difficulty Reports in her

decision, the Court cannot tell whether the ALJ accounted for the Sleep Difficulty Reports in her decision. The Sleep Difficulty Reports are material because Mottershaw testified that the primary symptom that kept her from working was her inability to sleep. The ALJ, therefore, failed to minimally articulate her analysis of the material evidence. As a result, this matter should be remanded. See Herron, 19 F.3d at 333. On remand, the ALJ should also discuss in more detail the statements in the record regarding the side effects of her medication, including her reports of her medications' impact on her sleeping problems.

On remand, the ALJ should also provide a more detailed analysis of Mottershaw's statements of the severity of her symptoms. The ALJ stated that Mottershaw's statements were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 31. The ALJ should explain in more detail about how Mottershaw's statements were inconsistent with the other evidence in the record.

On remand, the ALJ should also address Mottershaw's argument that she could not work because she would be absent from work too often. Mottershaw cites her numerous doctor's appointments as proof that she would be absent from work eight times a year due to her impairments, and

so, could not maintain employment. The record does not indicate that this argument was made to the ALJ before. As such, the ALJ should address the question of medical appointments and absence from work in the first instance and make appropriate findings of fact before this Court considers the argument further on review.

The Court sees no error in the ALJ's treatment of any of the medical opinion evidence. Dr. Du was a treating physician. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[2] The ALJ adequately explained why she determined that Dr. Du's opinions were not supported by other objective medical evidence in the record. The ALJ also explained why she discounted Dr. Du's opinions on the ultimate issue of whether Mottershaw was disabled.

The ALJ adequately explained why she concluded that nurse practitioner Bruckerhoff's opinions were inconsistent with other objective

---

[2] The Commissioner amended the regulations regarding the interpretations of medical evidence. The amendments, however, apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017). As such, the amendments do not apply here.

medical evidence in the records.  Additionally, the ALJ adequately explained why she discounted Bruckerhoff's opinions regarding the effect of Mottershaw's anxiety disorder on her functional capacity.  The ALJ correctly noted that Bruckerhoff was not specially trained in areas of mental health.

The ALJ adequately explained her analysis of the opinions of the state agency physicians.  Contrary to Mottershaw's argument, the ALJ did not materially rely on these opinions.  She discounted these opinions because the providers did not have the complete record and did not hear Mottershaw's testimony.  R. 31.

The Court also sees no error in the ALJ's evaluation of whether Mottershaw had a medically determinable impairment of fibromyalgia. Mottershaw complains that did not follow SSR 12-2p.  She argues that SSR 12-2p required the ALJ to consider both the American College of Rheumatology's 1990 and the 2010 diagnostic criteria for determining whether a person has fibromyalgia.  Mottershaw argues that the ALJ only used the 1990 diagnostic criteria.  The Court disagrees.  The ALJ was required to consider both sets of diagnostic criteria for determining whether Mottershaw had a medically determinable impairment of fibromyalgia.  SSR 12-2p, 2012 WL 3104869 at *2-*3 (July 25, 2012).  The 1990 and 2010

diagnostic criteria only relate to the question of whether the person has a medically determinable impairment. The criteria are not used to determine the severity of the impairment or the effect of the impairment on the person's functional capacity to work. See SSR 12-2p, 2012 WL 3104869 at *4-*6. The ALJ cited SSR 12-2p in analyzing whether Mottershaw had fibromyalgia. The ALJ found that Mottershaw had a medically determinable impairment of fibromyalgia. R. 24, 30. There was no error in this regard.

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Michelle Mottershaw's Motion for Summary Judgment (d/e 12) should be ALLOWED, the Defendant Commissioner filed a Motion for Summary Affirmance (d/e 15) should be DENIED, and the decision of the Defendant Commissioner should be REVERSED and REMANDED for further proceedings pursuant to 42 U.S.C. § 405(g) sentence four.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file a timely objection will constitute a waiver of objections on appeal. See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local

Rule 72.2.

ENTER:  February 1, 2021

_____s/ Tom Schanzle-Haskins_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE